```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                        SOUTHEASTERN DIVISION


KARI MASSEY,                       )
                                   )
            Plaintiff,             )
                                   )
      v.                           )       No. 1:09 CV 93 HEA/DDN
                                   )
                                   )
 MICHAEL J. ASTRUE,                )
Commissioner of Social Security,   )
                                   )
            Defendant.             )
```

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying plaintiff Kari Massey's application for disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 401, et seq. The action was assigned to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

**I.  BACKGROUND**

On April 19, 2007, Massey applied for disability insurance benefits and supplemental security income. She alleged an August 20, 2006 onset date of disability due to asthma, chronic obstructive pulmonary disease (COPD), severe allergies, severe migraines, hypertension, heart problems, anti-social personality, and depression. (Tr. 82-97, 110.) Her claims were denied initially. (Tr. 47.) On January 9, 2009, following a hearing, the ALJ denied her claims, finding that she was not under a disability as defined under the Act. (Tr. 10-22.)

On June 10, 2009, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the ALJ's decision stands as the final decision of the Commissioner.

**II.  MEDICAL AND OTHER HISTORY**

Plaintiff was born in 1975. She is 5 feet 4 inches tall and weighs about 240 pounds. (Tr. 174, 368.) She has smoked up to four packs of cigarettes per day. (Tr. 29, 420.) Her previous work included employment as a waitress from 1992 to 1995, as an end-of-line packager in a tool factory from 1997 to 2001, and as a printer from 2001 to 2006. (Tr. 111, 123-24.)

The record evidence shows treatment for migraine headaches. In March 2006, November 2006, April 2007, October 2007, January 2008, and July 2008, plaintiff sought treatment for migraines. She was treated with prescription injections and/or oral medications. (Tr. 188-89, 193, 316, 327, 408.) In April 2007, plaintiff reported that her medications were helping and that it had been six months since she experienced a headache lasting longer than a day. (Tr. 193.)

Shahid Choudhary, M.D., a neurologist, examined plaintiff in July 2007. (Tr. 237-39.) He diagnosed mixed migraine and tension headaches. He found no focal neurological deficit and noted that Topamax, a prescription medication used to prevent migraines, appeared to be working. (Tr. 238.) He increased her Topamax with follow-up in four months.

On November 14, 2007, plaintiff saw Dr. Choudhary for numbness, tingling, and pain in both of her feet and legs. Nerve conduction studies of both lower extremities were normal. (Tr. 286-87.)

In June 2008, a computerized tomography (CT) scan of plaintiff's head was normal. (Tr. 414.) In August 2008, during follow-up of an ankle injury, plaintiff reported a headache, but the record contains no indication of severe symptoms. (Tr. 399.)

Plaintiff was diagnosed with asthma in January 2007. (Tr. 203.) In February 2007 she reported that her asthma was bothering her; examination revealed her chest was clear. (Tr. 195.) In April 2007 she reported increased shortness of breath after running out of Albuterol, a prescription medication used to treat asthma. (Tr. 175.) Treatment with Albuterol relieved her symptoms at that time. (Tr. 175.) She was seen for family planning, insomnia, and wheezing later that month. She was prescribed a sleep aid, instructed on smoking cessation, and a sleep study was ordered. (Tr. 192.)

On April 10, 2008, plaintiff was seen by Dennis Daniels, M.D. for an initial evaluation. She complained of worsening respiratory symptoms, although Dr. Daniels noted she had reduced her daily use of breathing treatments. (Tr. 345.) She reported that her shortness of breath occasionally awakened her at night. (Tr. 345.) Dr. Daniels diagnosed tobacco dependency and suggested she use nicotine lozenges to try and quit smoking. Dr. Daniels found no physical symptoms other than coarse rhonchus[1] breath sounds. (Tr. 345.) Dr. Daniels prescribed Prednisone, a steroid, as well as Mucinex, a non-prescription expectorant and cough suppressant. (Tr. 346.)

Plaintiff saw Dr. Daniels again on May 13, 2008. Pulmonary function tests were normal. Allergy tests were positive for cat, dog, and various trees and grasses. (Tr. 350.) Dr. Daniels prescribed additional allergy medications and began the approval process for injectable allergy treatments or immunotherapy. (Tr. 351.)

Plaintiff sought medical treatment in September 2007 for pain in her legs, for which she was prescribed Vitamin B-12 injections. (Tr. 267-74.) X-rays in October 2007 revealed mild degenerative arthritis and slight scoliosis, with no significant degenerative changes. (Tr. 276.) Plaintiff complained of further numbness and tingling in her legs. A nerve conduction study was conducted in November 2007, and the results were normal. (Tr. 287.)

Plaintiff was treated at the Ripley County Family Clinic on February 14, 2008 after slamming her right thumb in a car door. Her medical problems included asthma, COPD, bronchitis, Vitamin B12 deficiency, migraine headache, and low back pain. She requested and received a note from her doctor stating that she needed her husband to stay at home to take care of her and her child. (Tr. 369.)

An August 8, 2007 Psychiatric Review by state agency psychologist J. Singer, Ph.D. determined that plaintiff had an anxiety neurosis but did not have a severe mental impairment. (Tr. 241-52.)

---

[1] An added sound with a musical pitch occurring during inspiration or expiration, heard on auscultation of the chest, and caused by air passing through bronchi that are narrowed by inflammation, spasm of smooth muscle, or presence of mucus. Stedman's Medical Dictionary 1693 (28th ed. 2006).

In June 2008, Dr. Daniels referred plaintiff to Larry Allen, M.Ed., LPC, for complaints of depression and anxiety. (Tr. 341-44.) She reported handling her own finances, being involved in her son's parent-teacher organization, and enjoying fishing and swimming, but claimed few close personal relationships and stated that she did not enjoy any mental or spiritual activities. (Tr. 343-44.) Allen diagnosed recurrent, moderate major depressive disorder and assessed a Global Assessment of Functioning (GAF) score of 60.[2] (Tr. 344.)

On October 16, 2008, plaintiff saw Talia Haiderzad, M.D., a psychiatrist, at the referral of her primary care physician. (Tr. 419-22.) She complained of nerves, anxiety and anger problems, and stated she was not socializing at all. She reported that her husband had tried to commit suicide in front of her two years ago; sleep disturbance; poor appetite, although she reported that one some days she cannot stop eating; decreased energy level; and difficulty concentrating. She felt hopelessness, helplessness, worthlessness, and guilt. She reported a history of physical and sexually abuse as a child. (Tr. 419.) She reported that she heard voices at night telling her that she was worthless and that she was a bad parent. (Tr. 421.)

Dr. Haiderzad recorded plaintiff's affect as anxious, depressed, and tearful, but noted that she was well oriented and exhibited fair to good attention and concentration, intact memory, and fair insight and judgment. She reported attempting to commit suicide by overdosing in 2004. (Tr. 421.)

Dr. Haiderzad diagnosed major depressive disorder with psychotic features; mood disorder, not otherwise specified; generalized anxiety disorder; post-traumatic stress disorder; physical/sexual abuse victim,

---

[2]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed., American Psychiatric Association 2000).

and nicotine dependence. Dr. Haiderzad assigned a GAF score was 55 and wanted to rule out bipolar disorder. (Tr. 421.) She prescribed Abilify, an anti-psychotic and antidepressant; Lexapro, an antidepressant; and outpatient counseling. Xanax, for anxiety, was increased. Trazodone was prescribed as needed for sleep. (Tr. 421-22.) Plaintiff told Dr. Haiderzad that she had cut her smoking from four packs per day to one, but was not ready to quit entirely. She was also instructed on weight loss. (Tr. 420.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on October 28, 2008. Plaintiff appeared and was represented by counsel. (Tr. 23-37.) Plaintiff testified that she was 33 years old and lived with her unemployed husband and seven year old son. (Tr. 32-33.) She testified that she suffers from shortness of breath that prevents her from walking more than 40 feet at a time, and that any type of "fast exertion," such as climbing stairs, triggers shortness of breath. (Tr. 29.)

She testified that in the past six months she had reduced her smoking from four packs to one-half pack per day. (Tr. 29.) She testified that she could stand for only 30 to 60 minutes before her legs and feet began to swell and that she could lift no more than five pounds. (Tr. 30.) She described incapacitating migraine headaches that lasted between 24 and 72 hours and that occurred approximately once every one to two weeks. (Tr. 31-32.)

With respect to daily activities, she testified she was able to do laundry, complete homework with her son, work crossword and jigsaw puzzles, and watch television. She was not able to mop floors, drive, or engage in athletic activities. (Tr. 33-34.) She testified that she leaves the house only to go to the grocery store and doctor's appointments. She attends her sons baseball games only if she is feeling "really good." (Tr. 35.)

With respect to her allergies, she testified that the powders used at the printing factory where she last worked caused her serious problems, and that she was terminated from that job for excessive medical absences. (Tr. 27, 36.) She testified that she had not yet

received approval for allergy injections. (Tr. 29.) She testified that she received unemployment compensation from August 20, 2006, the date of her termination, until March 2007. (Tr. 37.)

### III. DECISION OF THE ALJ

On January 9, 2009, the ALJ rendered an unfavorable decision. (Tr. 13-22.) The ALJ found plaintiff had the severe, medically determinable impairments of major depressive disorder, generalized anxiety disorder, COPD, asthma, mixed migraine and tension headaches, hypertension, and obesity, but that she did not have an impairment or combination of impairments listed in or medically equal to one found in the listings. 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 15-17.)

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform a reduced range of medium work as defined in 20 C.F.R. § 404.1567(c). This was limited by the ability to lift and carry only 50 pounds occasionally and 25 pounds occasionally;[3] standing or walking no more than 6 hours in an 8-hour work day; avoiding concentrated exposure to hazards or pulmonary irritants; and performing no more than simple work activity. (Tr. 17.) Based on plaintiff's credible RFC, the ALJ concluded that plaintiff could perform her past relevant work (PRW) as a packager. (Tr. 21.) Consequently, the ALJ found plaintiff was not disabled.

---

[3]The undersigned believes there is a clerical error in the ALJ's RFC statement and that the ALJ intended to write "50 pounds occasionally and 25 pounds *frequently*." The ability to lift no more than 50 pounds occasionally and 25 pounds frequently is a key component of the medium exertional level as defined in 20 C.F.R. § 404.1567(c). This would be inconsistent with the ALJ's finding that plaintiff could perform her past relevant work. (Tr. 21.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to her past relevant

work.  Id.  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred in assessing her credibility, specifically in failing to put more weight on her hearing testimony; and in determining her RFC and finding that she is able to return to her PRW.

**Credibility and Residual Functional Capacity**

The ALJ found that plaintiff had the RFC to perform a reduced range of medium work as defined in 20 C.F.R. § 404.1567(c).  This was limited by the ability to lift and carry only 50 pounds occasionally and 25 pounds frequently;[4] standing or walking no more than 6 hours in an 8-hour work day; avoiding concentrated exposure to hazards or pulmonary irritants, and performing no more than simple work activity.  (Tr. 17.) Based on plaintiff's credible RFC, the ALJ concluded that plaintiff could perform her PRW as a packager.  (Tr. 21.)

Plaintiff argues the ALJ erred in assessing her credibility and in determining her RFC.  She argues that the record evidence does not support a finding that she can perform medium work because she cannot meet the standing or lifting requirements.  She argues the ALJ ignored her treating physician's February 14, 2008 opinion regarding her diagnoses and that she needed her husband at home to help with their child.  She argues the ALJ erred in failing to adequately address her mental impairments; failing to put more weight on her hearing testimony; and in making a negative inference regarding her receipt of unemployment benefits.  The Commissioner, on the other hand, contends the ALJ properly assessed plaintiff's credibility in determining her RFC.  The undersigned agrees.

RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the

---

[4]See footnote 3.

responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Ultimately, RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Pearsall, 274 F.3d at 1217-18. The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). The undersigned concludes that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

Here the ALJ cited plaintiff's descriptions of her daily activities, including caring for her son, helping her son with homework, doing some housework, and grocery shopping. (Tr. 18.) The ALJ found plaintiff's daily activities were inconsistent with her allegations of disabling symptoms and limitations. The ALJ noted the plaintiff was essentially able to live and function independently, provide care for her minor son, and perform some household chores and grocery shopping. He noted that no physician, treating or otherwise, ever placed any specific long term work related restrictions on plaintiff's activities or expressed an opinion that she is disabled. The ALJ concluded, that to the extent plaintiff's daily activities were restricted, they appeared to be restricted largely as a matter of choice, rather than any apparent medical prescription. (Tr. 18.)

Another factor in the ALJ's credibility determination was the absence of any medical evidence to support the claimed severity of her symptoms. Although plaintiff testified that she suffered frequent, debilitating migraine headaches that lasted for days, the medical record

reflected only two medical visits directly prompted by headaches in the year prior to the administrative hearing.  (Tr. 19, 327, 408.)

The ALJ found the medical evidence supporting plaintiff's claim of disabling COPD and asthma was also unpersuasive because she rarely sought medical attention for breathing problems.  When she did seek treatment, her physicians found little or no objective evidence of disabling pulmonary problems, and her symptoms were largely controlled with medication.  (Tr. 19, 175, 195, 345.)

With respect to plaintiff's mental status, the ALJ noted that although plaintiff claimed several mental impairments in her disability application, she did not seek any type of mental health treatment until June 2008.  (Tr. 19.)  The ALJ also noted there was no record of inpatient mental health care or urgent psychiatric interventions, and her mental symptoms imposed only mild or moderate limitations in her functioning.  (Tr. 19.)

The ALJ also cited other factors in his credibility determination, including his observations of plaintiff's demeanor at the hearing, her receipt of unemployment compensation after her alleged onset date, and her conservative course of medical treatment.  (Tr. 18-19.)

The undersigned notes plaintiff testified at the administrative hearing that she was unable to stand for more than one hour at a time. (Tr. 30.)  This claim, however, is not supported by the medical record evidence.  Plaintiff's sole diagnosed condition affecting her legs is a vitamin B-12 deficiency, which has been treated effectively with periodic injections. (Tr. 274.) Diagnostic imaging and nerve conduction studies found no significant problems in plaintiff's spine, hips, or legs.  (Tr. 266, 276, 287.)  Moreover, no physician ever placed any limitations on plaintiff's ability to stand or walk.

Plaintiff relies on a physician's note dated February 14, 2008 recommending that her husband stay at home to care for her and their child.  (Tr. 367-69 )  The undersigned concludes the note is not entitled to controlling weight.  It appears that the note was written at plaintiff's request during an office visit when plaintiff was seen for injuring her hand in a car door.  There is no indication that the note was intended as a long-term recommendation.  Nor does it include any

specific opinion on plaintiff's functional limitations or an opinion on the expected duration of any limitations. See Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (ALJ is required to afford controlling weight to the opinion of a treating source when the medical opinion of claimant's own physician is at issue and only when that physician has examined the claimant a sufficient number of times to form a credible opinion).

In sum, the undesigned concludes the ALJ articulated the inconsistencies upon which he relied in discrediting plaintiff's testimony and provided ample reasons for determining plaintiff was not entirely credible in describing the intensity, persistence, and limiting effects of her symptoms. See Gonzalez v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (an ALJ may properly discount a claimant's subjective complaints if inconsistencies exist in the record as a whole); 20 C.F.R. §§ 404.1529(c) and 416.929(c). Because substantial evidence in the record as a whole supports the finding, the undersigned recommends affirming the ALJ's finding that plaintiff was not credible to the extent she claimed she was disabled.

**Past Relevant Work**

The ALJ also found that plaintiff was capable of performing her PRW as a packager and that this work does not require the performance of work-related activities precluded by her RFC. (Tr. 21.) The ALJ found plaintiff had PRW as a line worker or hand packager and that she performed this job from 1997 to 2001 at the substantial gainful activity level. The ALJ noted plaintiff described this work as light exertional work level work activity. (Tr. 21, 123.)

Plaintiff asserts the medical evidence does not support the ALJ's finding that she has the physical ability to perform the demands of medium work, and therefore she cannot return to her PRW.

As to plaintiff's argument that the ALJ failed to include additional limitations in her RFC, as discussed above, the undersigned concludes the ALJ properly discredited plaintiff's subjective allegations of disabling limitations. Moreover, the ALJ need not

- 11 -

include limitations found not credible in the RFC. See <u>Pearsall v. Massahari</u>, 274 F. 3d 1211, 1218 (8th Cir. 2001).

If a claimant can perform her PRW, either as she performed it, or as the work is performed in the national economy, then she is not disabled. <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996). In determining a claimant's capacity to perform PRW, the ALJ must make explicit findings regarding the physical and mental demands of a claimant's past work and compare the demands of the past work with the claimant's RFC. See <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 568-69 (8th Cir. 1999). The ALJ may fulfill that responsibility by referring to the job descriptions in the Dictionary of Occupational Titles (DOT). <u>Sells v. Shalala</u>, 48 F.3d 1044, 1047 (8th Cir. 1995).

Here, the ALJ referred to DOT job number 920.587-018, which places the occupation of hand packager at the medium exertional level, which requires exerting up to 50 pounds of force occasionally and up to 25 pounds of force frequently. (Tr. 21). DOT App. C. The exertional requirements described in the DOT are within the RFC as determined by the ALJ. (Tr. 17.) The ALJ noted that plaintiff described the work, as she performed it, within the light exertional level, and therefore she could have performed her PRW even had he determined a more restrictive RFC. (Tr. 21, 123). Based on the above, the undersigned concludes the ALJ's finding that plaintiff could perform her PRW as a packager is supported by substantial evidence in the record as a whole.

## **VI. RECOMMENDATION**

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file documentary objections to this Report and Recommendation. The failure to file timely documentary objections may waive the right to appeal issues of fact.

/S/    David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 3, 2010.